# In the United States Court of Federal Claims

No. 08-533C

(E-Filed: June 30, 2014)

| | |
|---|---|
| CARDIOSOM, L.L.C., | ) |
| | ) |
| | ) Cross-Motions for Summary |
| Plaintiff, | ) Judgment; RCFC 56(a); Breach of |
| | ) Contract; Contract Interpretation; |
| v. | ) Risk-Shifting Contract Language |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Jerry Stouck, Washington, D.C., for plaintiff.

Anuj Vohra,[1] Trial Attorney, with whom were Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Jamie B. Insley, Attorney, Office of General Counsel, Department of Health and Human Services, of counsel.

OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a claim for breach of contract that arises out of the government's termination of plaintiff's contract to supply durable medical equipment to Medicare recipients.[2] See Corrected Compl. ¶¶ 22-23, ECF No. 10.

---

[1]   Defendant's current counsel of record is Gregg M. Schwind, Senior Trial Counsel.

[2]   Plaintiff also has asserted a takings claim. Corrected Compl. ¶¶ 24-26, ECF No. 10. As provided in the court's March 26, 2012 Order, the court has deferred consideration of the takings claim until after it has decided the breach of contract claim. Order, ECF No. 63. Therefore, plaintiff's takings claim is not addressed in this Opinion.

Cardiosom, L.L.C. (plaintiff or Cardiosom) is a Medicare contractor. Centers for Medicare & Medicaid Services (CMS) of the Department of Health & Human Services (defendant or HHS) administers the Medicare program. Effective July 1, 2008, CMS contracted with Cardiosom to provide specified equipment to Medicare beneficiaries.

On July 15, 2008, Congress passed legislation directing HHS to cancel certain contracts, including the subject contract in this action. It is undisputed that defendant terminated plaintiff's contract. What is disputed is whether defendant's termination of plaintiff's contract amounts to a breach.

Defendant argues that certain language in the contract shifted the risk of regulatory change to Cardiosom. Defendant adds that because Cardiosom accepted the risk that its contract could be terminated by a change in the governing statute, it cannot maintain the instant action for breach of contract.

Plaintiff counters that the contract language on which defendant relies states only that plaintiff was required to comply with relevant statutes and regulations. Plaintiff insists that nothing in the referenced contractual language precludes it from maintaining a breach of contract claim. Plaintiff adds that accepting defendant's characterization of the contract language would render the contract illusory because defendant could terminate the contract at will, with no further obligation to plaintiff. Such a reading, plaintiff asserts, must be rejected.

Pending before the court is plaintiff's motion for summary judgment on contract liability, and defendant's cross-motion for summary judgment on contract liability. Both motions are ripe for consideration. Oral argument was neither requested by the parties nor deemed necessary by the court. For the reasons explained below, plaintiff's motion for summary judgment is **GRANTED**, and defendant's cross-motion for summary judgment is **DENIED**.

I.     Background

Plaintiff filed this claim on July 22, 2008. Compl., ECF No. 1. On July 24, 2009, plaintiff moved for summary judgment on contract liability. Pl.'s Mot., ECF No. 36. Defendant filed a cross-motion on summary judgment on September 15, 2009. Def.'s Mot., ECF No. 41. Plaintiff and defendant each filed reply briefs. Pl.'s Reply, ECF No. 44. Def.'s Reply, ECF No. 45. In addition, the parties filed a Consolidated Statement of Uncontroverted Facts on November 16, 2009. ECF No. 46 (Fact Stmt.). Plaintiff also filed the declaration of Kevin P. Greisl, President of Cardiosom, which is incorporated by reference in the Consolidated Statement of Uncontroverted Facts. ECF No. 37-1 (Greisl

Decl.). The contract at issue is included as Exhibit A to the Greisl declaration, and the contract termination letter CMS sent to Cardiosom is included as Exhibit B to the Greisl declaration. Greisl Decl. Exs. A, B.

The facts of this case regarding contract termination are not in dispute. A detailed recitation of these facts has been set forth in previous decisions of both the Federal Circuit and this court. See Cardiosom, L.L.C. v. United States, 656 F.3d 1322 (Fed. Cir. 2011) (finding that the immunity provision in MIPPA did not manifest an unambiguous intent to withdraw the Tucker Act's waiver of sovereign immunity), rev'g 91 Fed. Cl. 659 (2010); Cardiosom, L.L.C. v. United States, 115 Fed. Cl. 761 (2014) (finding that neither MIPPA nor the interpreting regulations precluded plaintiff from proceeding with its Tucker Act breach of contract claim). These decisions, however, did not address contract liability. For ease of reference, a brief review of the pertinent facts follows.

In April 2007, CMS issued a final rule establishing a Competitive Acquisition Program (CAP) for the supply of Durable Medical Equipment, Orthotics and Supplies (DMEPOS) to Medicare beneficiaries in specified areas. Fact Stmt. ¶ 2. In July 2007, Cardiosom submitted a bid to CMS for what was known as Round 1 of the CAP. Id. at ¶ 3. On March 21, 2008, CMS notified Cardiosom that it was a successful bidder. Id. at ¶ 4.

Under the terms of the contract, which became effective on July 1, 2008, Cardiosom agreed to provide, on CMS's behalf, oxygen and/or respiratory equipment and supplies in nine different metropolitan areas for a period of three years. Id. at ¶¶ 1, 4. Two weeks later, on July 15, 2008, Congress passed legislation terminating all contracts, that had been issued under the Round 1 contracting process. Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) § 154, 42 U.S.C. § 1395w-3(a)(1) (2012). Plaintiff's contract with CMS was among those terminated. Fact Stmt. ¶ 6.

After filing its complaint in this court in 2008, plaintiff sought damages through an administrative process established by CMS for contractors, like Cardiosom, whose contracts were terminated after the passage of MIPPA. See Pl.'s Second Supp. Br.[3] Ex. A, ECF No. 69, at 40-43. Cardiosom received partial payment on its administrative claim. Pl.'s Second Supp. Br. Ex. B, ECF No. 69, at 47.

---

[3]   In May 2012, Cardiosom filed additional briefing at the request of the court. See Pl.'s Second Supp. Br., ECF No. 69.

II.     Legal Standards

    A.      Jurisdiction

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1)(2012).  It does not, however, "create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, the right to money damages must be found in a separate source of law.  See Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).  "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary."  Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

    B.      Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A genuine dispute is one that "may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A fact is "material" if it "might affect the outcome of the suit."  Id. at 248.  The moving party carries the burden of establishing its entitlement to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once that burden is met, the onus shifts to the non-movant to identify evidence demonstrating a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor.  Liberty Lobby, 477 U.S. at 256.

In considering a motion for summary judgment, the court does not weigh each side's evidence but, rather, must draw all inferences in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Where, as here, the parties have filed cross-motions for summary judgment, the court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration.  Marriot Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).  To the extent there exists a genuine issue of material fact, both motions must be denied.  Id. at 969.

C.  Breach of Contract

The "[f]ailure to perform a contractual duty when it is due is a breach of the contract."  Winstar Corp. v United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995) (citing Restatement (Second) of Contracts § 235(2) (1981)).

"To recover for breach of contract, a party must allege and establish:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989).

D.  Contract Interpretation

Determining the obligation or duty that arises out of a contract "is a legal question of contract interpretation," id., and contract interpretation is "generally amenable to summary judgment," Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002).  The general rules of contract interpretation apply to contracts into which the government has entered as a party.  Lockheed Martin IR Imaging Sys. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).

It is "a fundamental precept of common law that the intention of the parties to a contract controls its interpretation."  Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (internal quotation marks omitted); see also Padilla v. United States, 58 Fed. Cl. 585, 591 (2003) ("When interpreting disputed contractual provisions, the primary objective for the court is to determine the intent of the parties to the contract at the time they contracted.").  The intention of the parties is gathered from the four corners of the contract.  See Mktg. & Mgmt. Info., Inc. v. United States, 57 Fed. Cl. 665, 674 (2003) ("The parties' respective rights and responsibilities would normally be found only within the four corners of the contract.").

In interpreting a contract, we begin with the plain language of the contract.  C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").  "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning."  Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998).  The plain language of the contract "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."  TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (internal quotation marks omitted).

When interpreting the plain language of a contract, the "contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed. Cir. 1992). "A reasonable interpretation must 'assure that no contract provision is made inconsistent, superfluous, or redundant.'" Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (quoting Lockheed Martin, 108 F.3d at 322).

III.  Discussion

The court considers whether plaintiff has satisfied the required showing for a breach of contract claim and if so, whether defendant has provided a valid defense.

   A.   Plaintiff's Breach of Contract Claim

It is undisputed that a valid contract existed between the parties. See Fact Stmt. ¶ 5 ("On June 20, 2008, CMS and CardioSom executed a 'Medicare Durable Medical Equipment, Prosthetics, Ortohotics, and Supplies (DMEPOS) Competitive Bidding Program Contract.'"); Greisl Decl. Ex. A (contract).

It is also undisputed that defendant cancelled Cardiosom's contract effective June 30, 2008 and thus, failed to perform its duties. See Fact Stmt. ¶ 7 ("CMS notified CardiSom of the termination of its contract by letter dated July 21, 2008 . . . ."). In its July 21, 2008 letter, CMS told Cardiosom that in accordance with 42 U.S.C. § 1395w-3(a)(1), Cardiosom's contract was "completely terminated effective June 20, 2008." Greisl Decl. Ex. B.

Plaintiff asserts that it was harmed by the contract termination. Fact Stmt. ¶¶ 8, 10. Defendant objects to plaintiff's asserted damages, "[on] the grounds that it is based entirely upon the declaration of plaintiff's principal, and there is no independent evidence in the contemporaneous record to support it. Absent such evidence, defendant [claims it] is unable at this time to either confirm or refute the accuracy of [the damages] statement." Id.

Plaintiff contends, that in fact, it "incurred expenses in reliance on the Agreement [with CMS] and suffered damages, as set forth in the accompanying declaration of its President," Kevin P. Greisl. Pl.'s Mot. 28 (citing Greisl Decl. ¶¶ 9,10, 14, 15). Mr. Greisl declared that CMS notified Cardiosom on March 21, 2008 that it was a successful bidder in nine areas in which it had submitted bids, and "awarded CardioSom the right to . . . qualified supplier [status] for a three-year term beginning on July 1, 2008." Greisl Decl. ¶ 6. Based on this received notice, "[b]etween March 21, 2008 and July 1, 2008,

CardioSom incurred significant out of pocket expenses and liabilities in preparing to perform its obligations under the Agreement." Greisl Decl. ¶ 9; Fact Stmt. ¶ 8. Mr. Greisl further declared that Cardiosom's additional damages include the "lost . . . profits it would have earned as a contract supplier during the 3-year term" of the terminated contract. Greisl Decl. ¶ 15; see also Fact Stmt. ¶ 10.

Plaintiff later filed a detailed explanation of the damages request it submitted to CMS in March 2010, including, inter alia, its termination wages and expenses, as well as rent and utility costs it incurred for its new sites. Pl.'s Supp. Br. Ex. A, at 40-43. CMS reimbursed Cardiosom for a portion of these termination expenses in August 2011. Pl.'s Supp. Br. Ex. B, at 47.

The "[f]ailure to perform a contractual duty when it is due [constitutes] a breach of the contract." Winstar Corp. v United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995). The court finds that plaintiff has shown that it had a valid contract with CMS, that CMS had a duty under that contract and that in terminating Cardiosom's contract, CMS breached that duty. The court also finds that Cardiosom has provided sufficient evidence that it incurred damages attributable to the contract termination to satisfy its breach of contract.

Plaintiff has established its breach of contract claim and thereby, has proven defendant's contract liability.

B.   Defendant's Risk-Shifting Defense

Urging that the disputed contract language precludes a finding of breach, defendant puts forward a defense to plaintiff's claim. Def.'s Mot. 32 (stating that Cardiosom's attempts to rebut its argument that the contract language is "a valid defense against [Cardiosom's] claim of breach . . . are of no moment."). The question for the court is whether defendant has presented a valid defense. The burden to prove such a defense rests with defendant, see Brunswick Bank & Trust Co. v. United States, 707 F.2d 1355, 1360 (Fed. Cir. 1983); Eden Isle Marina, Inc. v. United States, 89 Fed. Cl. 480, 523 (2009), and defendant must prove its defense by a preponderance of the evidence, see Thomas v. Nicholson, 423 F.3d 1279, 1283 (Fed. Cir. 2005).

Defendant's particular burden is to show that the disputed contract language, Article II.D of the contract, when read in the context of this court's contract interpretation case law, see supra Part II.D, is read correctly as risk-shifting language.

Risk-shifting language refers to contractual language that shifts the risk of regulatory change from the government to the contractor. The risk of regulatory change

refers to the risk that Congress might pass a new statute, or an agency might promulgate a new regulation, that would prevent the agency from meeting its obligations, as promised under an existing contract with a private party. See generally United States v. Winstar Corp., 518 U.S. 839, 881 (1996). The risk of regulatory change rests with the agency, because it would be the agency that could not perform its promise and would be in breach and thus liable for damages. "Winstar stands for the proposition that the government is still obligated to honor its contracts even if the governing regulations change," preventing its performance. Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1342-43 (Fed. Cir. 2004) (citing Winstar Corp., 518 U.S. at 869-70).

Parties to a contract, however, may address "the risk-shifting issue" during bargaining, and may elect to shift the risk from the government to the contractor. Id. at 1343 (citing Winstar, 518 U.S. 869 n.15). In contrast, contract language that simply requires the contractor to comply with applicable laws and regulations does not shift the risk of regulatory change to the contractor. See Winstar, 518 U.S. at 868.

The court considers the plain language of Article II.D, as well as defendant's arguments for the contract interpretation proposed.

        1.        Contract Language

Article II.D of the contract states in its entirety: "[t]his Contract is subject to any changes in the Medicare statute or regulations that affect the Medicare program." Greisl Decl. Ex. A, at 4.

According to defendant,

> Cardiosom's contract, at Article II.D, expressly states that it "is subject to any changes in the Medicare statute or regulations that affect the Medicare program." . . . CMS' termination of Cardiosom's contract was pursuant to the express direction of section 154 of the MIPPA – a change to the Medicare program. Accordingly, CMS' termination was not a breach of Cardiosom's Round 1 . . . contract.

Def.'s Mot. 25. Defendant urges that the plain meaning of the language at Article II.D "should be given effect by this Court," id., and that "nothing in the language of Article II.D limits its scope or effect upon the parties," id. at 27. Defendant reasons that

> Article II.D simply reflects the parties' understanding that the Medicare statute provides the regime under which the DMEPOS CAP operates, and

  that in the event the statute were to change in a matter that affected the rights of the parties, <u>such a change would not constitute a breach of contract</u>.

Id. at 31 (emphasis added).

  While defendant bases its argument on a narrow interpretation of Article II.D standing alone, the court must consider the contract as a whole. See Granite Constr. Co., 962 F.2d at 1003. The contract is not long, just under seven pages, exclusive of signatures and attachments. Greisl Decl. Ex. A, at 3-9. Review of the whole contract shows that Articles II and III are particularly relevant to the matter at issue. In its entirety Article II states,

Article II
Compliance with Laws and Regulations

A. The Contract Supplier, and its affiliated companies and subcontractors, shall comply with all applicable Federal laws and regulations including, without limitation, the final rule on Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) and Other Issues that appeared in the Federal Register on April 10, 2007 (72 Fed. Reg. 17992) and 42 CFR, Part 414, Subpart F.

B. This Contract does not supersede or modify 42 CFR, Part 414, Subpart F. Failure to reference a statutory or regulatory requirement in this Contract does not affect the applicability of such requirement to the Contract Supplier. In the event of conflict or ambiguity between this Contract and any applicable Federal law or regulation, the conflict or ambiguity shall be resolved consistent with the applicable Federal law or regulatory requirements.

C. The Contract Supplier shall comply with all applicable State laws, including any applicable State licensing requirements, pertaining to functions under this Contract.

D. This Contract is subject to any changes in the Medicare statute or regulations that affect the Medicare program.

Id. at 4.

The plain text of Article II indicates that the entire Article, including the subpart denoted as Article II.D, relates to "Compliance with Laws and Regulations." Articles II.A, II.B, and II.C each address the contract supplier's obligation to comply with relevant statutory or regulatory provisions. Defendant urges the court to give effect to the language of Article II.D as risk-shifting language. But defendant offers no explanation as to why it urges a reading of Article II.D that is inconsistent with the text in that Article as well as the language in the balance of the contract.

The other relevant contract provision, Article III, is excerpted in relevant part below.

> Article III
> Contract Period, Breach and Remedies, and Severability
>
> A. Contract Period
>
> The Contract period shall commence on 07/01/2008 and end on 06/30/2011, unless terminated earlier by CMS as provided in III.B of this Contract.
>
> B. Contract Breach and Remedies
>
> 1. Breach of Contract
>
> Pursuant to 42 CFR 414.422(f)(1), any violation of the terms of this Contract by the Contract Supplier, including failure to comply with licensing and accreditation requirements, constitutes a breach of contract.

Id.

This Article defines the contract period. As addressed in Article III.A, the parties contemplated that a breach by Cardiosom would be the sole ground for CMS to terminate Cardiosom's contract prior to June 2011. Id.

Defendant argues that "[g]iven that the Medicare statute created the DMEPOS CAP, it was not unreasonable to think that the statute could be modified to terminate the program, or the contracts entered into as part of that program." Def.'s Mot. 30. Defendant offers no explanation, however, as to why Article III.A—the provision in which the contract period is defined—is silent about such a circumstance.

10

2. Case Law

Defendant argues that the language of Article II.D is "risk-shifting language," like that considered by the Federal Circuit in <u>Admiral Financial</u>. Def.'s Mot. 28-32 (citing <u>Admiral Fin. Corp. v. United States</u>, 378 F.3d 1336 (Fed. Cir. 2004)).

The contract language at issue in <u>Admiral Financial</u> is as follows:

> All references to regulations of the [Federal Home Loan Bank Board (Bank Board)] or the [Federal Savings and Loan Insurance Corporation (FSLIC)] used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this Agreement.

<u>Admiral Fin.</u>, 378 F.3d at 1339. This clause, designated as clause VI(D), was included in a section of the contract entitled "Miscellaneous Provisions." <u>Id.</u>

The Federal Circuit has instructed that the plain language of a contract "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." <u>TEG-Paradigm Envtl.</u>, 465 F.3d at 1338 (internal quotation marks omitted). To place the instant contract in proper context, the court reviews the relevant background information from <u>Admiral Financial</u>.

<u>Admiral Financial</u> is a <u>Winstar</u>-related breach of contract case. <u>Admiral Fin.</u>, 378 F.3d at 1337 (citing <u>Winstar Corp.</u>, 518 U.S. 839). <u>Winstar</u> provides a detailed description of the circumstances facing the thrift industry in the 1980s that resulted in numerous thrifts bringing breach of contract claims against the United States, including <u>Winstar</u> and <u>Admiral Financial</u>.

The late 1970s and early 1980s were difficult times for the savings and loan, or thrift, industry, bringing both high interest rates and inflation. <u>Winstar Corp.</u>, 518 U.S. at 845. Thrifts held long-term mortgages for which they earned low interest rates, but were increasingly obligated to pay higher interest rates to depositors to attract funds. <u>Id.</u> "When the costs of short-term deposits overtook the revenues from long-term mortgages, some 435 thrifts failed between 1981 and 1983." <u>Id.</u> As the <u>Winstar</u> Court explained,

> the multitude of already-failed savings and loans confronted FSLIC with deposit insurance liabilities that threatened to exhaust its insurance fund

11

> . . . . in 1985, when the Bank Board estimated that it would take $15.8 billion to close all institutions deemed insolvent under [Generally Accepted Accounting Principles]. By 1988, the year of the last transaction involved in this case, FSLIC was itself insolvent by over $50 billion. . . .
>
> Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." . . . [T]he principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

Id. at 846-48 (internal citations omitted).

In considering whether the contract language in Admiral Financial's contract was risk-shifting language, the Federal Circuit looked to an Eleventh Circuit case in which that court had found that a contract clause identical to the one at issue, clause VI(D), was risk-shifting. Admiral Fin., 378 F.3d at 1339-40 (citing Guaranty Fin. Servs., Inc. v. Ryan, 928 F.2d 994, 999 (11th Cir. 1991)).

> The [Eleventh Circuit] explained that the clause "unmistakably warn[ed] Guaranty that its obligations under the contract may be increased by subsequent regulation." [Guaranty, 928 F.2d at 999.] The court held that "the agencies, at the same time they made that promise [of regulatory forbearances], also unambiguously warned Guaranty that the rules might later change to Guaranty's detriment," and that "[b]y signing the contract, Guaranty took that chance, in effect wagering the chance that the rules would be changed against the potential return if they were not." Id.

Id. (emphasis added). The Federal Circuit expressly followed the reasoning of the Eleventh Circuit in reaching its decision that clause VI(D) in Admiral Financial's contract was risk-shifting language. Id. at 1343 ("[F]ollowing the lead of the Eleventh Circuit in Guaranty . . . , we hold that Admiral assumed the risk of a regulatory change such as that brought about by FIRREA.[4]" (footnote added)).

---

[4] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183.

Defendant attempts to make a similar comparison here, notwithstanding the dissimilarity between the plain text of Article II.D in Cardiosom's contract and the language of clause VI(D) in Admiral Financial's contract. Article II.D states simply that "[t]his Contract is subject to any changes in the Medicare statute or regulations that affect the Medicare program," Greisl Decl. Ex. A, at 4; unlike the subject clause in the Admiral Financial contract, it includes no "'unmistakable warn[ing]'" to Cardiosom. See Admiral Fin., 378 F.3d at 1339-40 (quoting Guaranty, 928 F.2d at 999).

Moreover, Article II.D was included in a section of Cardiosom's contract entitled "Compliance with Laws and Regulations." Greisl Decl. Ex. A, at 4. In contrast, Clause VI(D) was included in a section of Admiral Financial's contract entitled "Miscellaneous Provisions." Id. at 1339.

Also distinguishable from the facts in this case are the circumstances in Admiral Financial surrounding contract formation. In February 1987, the individual who formed Admiral Financial contacted the Bank Board to discuss his interest in acquiring a failing thrift. Admiral Fin., 378 F.3d at 1337. Sixteen months later, in June 1988, the newly formed concern, Admiral Financial, signed an agreement with the Bank Board to acquire a failing thrift. Id. at 1338.

The Bank Board provided acquiring institutions, like Admiral Financial, a "particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." Winstar Corp., 518 U.S. at 848. In the case of Admiral Financial, the Bank Board treated the failing thrift's

> negative net worth as "goodwill," an asset, rather than as a liability. [The thrift] initially recorded nearly $9 million of goodwill based on its negative net worth. In May 1988, . . . the Bank Board[] agree[d] to allow the goodwill to be amortized over a period of 25 years using the straight-line method of depreciation.

Admiral Fin., 378 F.3d at 1338.

At the time Admiral Financial signed its agreement in June 1988, the thrift industry was at least eight years into a national crisis. An individual who spent more than one year in the late 1980s working with the Federal Home Loan Bank Board to acquire a failing thrift would have been keenly aware of the situation facing the thrift industry. The federal government was already attempting to restore stability to the thrift industry through agreements like the one the Bank Board entered into with Admiral Financial. Further government involvement, including congressional involvement through statutory

13

or regulatory change, was not unforeseeable. As the Federal Circuit said, "[o]n its face, clause VI(D) contemplated that the government might alter the regulations governing the supervision of thrifts such as [the thrift owned by Admiral Financial]; by agreeing to the clause, Admiral acknowledged that its obligations might change if the regulatory regime changed." Id. at 1339.

In this case, defendant seeks to analogize to the Admiral Financial case, asserting that "it was not unreasonable to think that the [Medicare] statute could be modified to terminate the program, or the contracts entered into as part of that program," Def.'s Mot. 30; but it points to nothing that supports this position. Ordinarily, a private concern does not enter into a contract with the federal government with the expectation that the contract will be statutorily terminated. Nor is there anything in the record to suggest that when Cardiosom signed the contract in March 2008, it had any idea that Congress might act to terminate the Round 1 contracts.

The record does show, however, that when CMS signed the contract on June 20, 2008, it knew that Congress was considering terminating the Round 1 contracts.

On May 6, 2008, the House Subcommittee on Health held a hearing on the Medicare DMEPOS Competitive Bidding Program, the program through which CMS issued Cardiosom's contract.[5] See Medicare's DMEPOS Competitive Bidding Program: Hearing Before the Subcomm. on Health of the H. Comm. on Ways & Means, 110th Cong. (2008) ("Hrg. Rpt."), available at http://www.gpo.gov/fdsys/search/home.action (follow Congressional Hearings hyperlink under "Browse" bar on right). The one witness testifying in person was the Acting Administrator of CMS, Mr. Kerry Weems. Hrg. Rpt. 6-32. Mr. Weems faced questioning critical of CMS's mismanagement of the Round 1 contracting process, as that process had resulted in the exclusion of numerous contractors from final bid consideration for reasons unrelated to bid content. Id. at 18-32. Observations made by two Members of Congress, which are representative of the questions and concerns expressed that day during the hearing, are set forth below.

Representative Sam Johnson stated:

---

[5] Defendant states that no committee reports accompanied the passage of MIPAA. Def.'s Mot. 18 n.10, ECF No. 41. While the May 8, 2008 subcommittee hearing preceded the passage of MIPAA, this committee report is part of the MIPAA legislative history. See generally Cardiosom, L.L.C. v. United States, 115 Fed. Cl. 761, 778-79 (2014).

14

> Congress can have all the good intentions in the world, but [when] the agency in charge [of] putting Congress' ideas into practice [is] missing some mark, it puts us in a difficult position. The number one issue I've heard about is the same all these other questioners have heard about.

Id. at 23. He then discussed the approximately 1000 contractors in Dallas, Texas who had submitted Round 1 bids, about 600 of which were rejected for a reason other than the amount of their bid. Id.

> Representative Dave Camp offered the following:
>
> Well, I would just have to say that Mr. Weems, this is [a] process where some people were not allowed to bid; and, so what's happened is there's an exclusive group of providers that are now going to be providing this equipment . . . . But, <u>what I would like to hear from you is a way to reform what you've been doing, because I would agree with Mr. Stark that I don't think this process has been one that stands scrutiny</u>.
>
> . . . .
>
> [L]et me suggest something. If you were to provide a 60-day window to re-examine the bids that were disqualified due to lack of information, do you believe a six-month delay would be necessary? Do you think a rebid would still be necessary if you could re-examine those folks that were disqualified?

Id. at 19-20 (emphasis added). The criticism of CMS's contracting process was pointed and oft-repeated.

About one month later, on June 12, 2008, the Chairman of the House Subcommittee on Health, Representative Pete Stark, introduced a bill to "delay and reform" the Medicare DMEPOS Competitive Acquisition Program (CAP). Medicare DMEPOS Competitive Acquisition Reform Act of 2008, H.R. 6252, 110th Cong. (2008), 2007 CONG US HR 6252 (Westlaw). H.R. 6252 directed that "the contracts awarded under this section [Round 1 of Competitive Acquisition Program] before the date of the enactment of this subparagraph are terminated." H.R. 6252 § 2 (a)(1)(A)(iv).

Eight days later, on June 20, 2008, Representative Charles Rangel introduced the bill that was later enacted as MIPPA. Medicare Improvements for Patients and Providers Act of 2008, H.R. 6331, 110th Cong. (2008) (enacted), 2007 CONG US HR 6331

15

(Westlaw).  The bill introduced by Representative Stark, H.R. 6252, was included in its entirety in the bill introduced by Representative Rangel, H.R. 6331, as Section 154. Compare H.R. 6252 § 2 (Delay in and Reform of Medicare DMEPOS Competitive Acquisition Program), with H.R. 6331 § 154 (same).

CMS signed the contract with Cardiosom on June 20, 2008, less than two months after Mr. Weems testified before Congress and after Representative Stark had introduced his bill terminating all Round 1 contracts.  A review of the circumstances surrounding the formation of the subject contract between CMS and Cardiosom reveals that although CMS was fully aware that Congress might terminate the Round 1 contracts—even as it signed Cardiosom's contract—Cardiosom was not.  This lack of awareness critically undercuts defendant's claim that Cardiosom agreed to bear the risk of any statutory or regulatory change.

Defendant's further contention that the contract in Cardiosom could be construed like the oil leases that were considered by the Supreme Court in Mobil Oil is also unavailing.  Def.'s Mot. 27-28, 33 (citing Mobil Oil Exploration & Producing Se. v. United States, 530 U.S. 604 (2000)).  The relevant facts of Mobil Oil, succinctly described by defendant, are as follows:

> [P]laintiff oil companies entered into lease agreements with the United States to explore and develop oil rights off the coast of North Carolina. [Mobil Oil, 530 U.S.] at 609.  Those lease agreements, and the oil companies' exploration and development rights, were made "subject" to certain requirements set out in the Outer Continental Shelf Lands Act ("OCSLA"), the Coastal Zone Management Act ("CZMA"), and accompanying existing regulations.  Id.  After the execution of those lease agreements and the plaintiffs' commencement of performance, Congress enacted another statute, the Outer Banks Protection Act of 1990 ("OBPA"), which set out new requirements that the oil companies had to meet prior to exploration, and delayed the Secretary of the Interior's ability to approve the oil companies' exploration plans and allow them to proceed with the time period specified in the lease agreements.  Id. at 611-13.  The oil companies sued, alleging that the new requirements set out in the OBPA breached their lease agreements, which were subject only to requirements and regulations set out in the OCSLA and CZMA.  The Court agreed, finding that the restrictions in the new statute were inconsistent with the promises in the original leases.  Id. at 624.

Def.'s Mot. 27-28.  The Mobil Oil Court found that defendant violated the contracts.

Mobil Oil, 530 U.S. at 618. Defendant argues that Mobil Oil is instructive because the Court—which found for plaintiff—"did not suggest that there was anything improper about the fact that the leases were expressly made subject to the OCSLA or the CZMA." Def.'s Mot. 28 (emphasis added). Defendant likens the Mobil Oil leases to the Cardiosom contract because Article II.D makes the contract "subject to" changes in the Medicare statute. See id. at 33. Defendant does not explain how this limited similarity between the language in Cardiosom's contract and in the Mobil Oil leases furnishes support for its reading of Article II.D as a risk-shifting provision. As plaintiff observed in its briefing, Mobil Oil "teaches little—if anything—about how that case would be decided" if the facts of that case were similar to the facts in Cardiosom. Pl.'s Reply 25-26. The court finds defendant's reliance on Mobil Oil to be unpersuasive.

Defendant also attempts to distinguish the case at bar from the Winstar case. Def.'s Mot. 32-33. In Winstar, the Court found the government liable for breach of contract even though the government was prevented from performing its contractual obligations by a change in the governing regulations. Winstar, 518 U.S. at 843, 868. In an effort to distinguish the contracts, defendant contends that, "unlike the contract clause in Winstar, the language [in] Article II.D of Cardiosom's contract does not simply state that Cardiosom must comply with certain laws and regulations. Instead, it states that Cardiosom's contract itself is subject to any changes in the Medicare Act . . . ." Id. at 32-33.

The Federal Circuit discussed the Winstar language in its evaluation of the Admiral Financial language.

> The Government also cites a provision requiring [the thrift] to "comply in all material respects with all applicable statutes, regulations, orders of, and restrictions imposed by the United States or . . . by any agency of [the United States]," but this simply meant that [the thrift] was required to observe FIRREA's new capital requirements once they were promulgated. The clause was hardly necessary to oblige [the thrift] to obey the law, and nothing in it barred [the thrift] from asserting that passage of that law required the Government to take action itself or be in breach of its contract.

Admiral Fin., at 1342 (quoting Winstar, 518 U.S. at 868-69).

Defendant asserts that the language in Cardiosom's contract differs from the language in Winstar because the phrase "subject to" appears in Article II.D. Def.'s Mot. 33. But defendant fails to explain how the "subject to" language supports its interpretation of Article II.D as risk-shifting language, notwithstanding the inclusion of

17

the clause in the contract section entitled "Compliance with Laws and Regulations." The court does not discern the distinction that defendant attempts to put forward and finds defendant's effort to distinguish the Winstar language unconvincing.

The court is not persuaded that the language in Article II.D is risk-shifting. Read in the context of the contract, it is simply compliance language; it did not shift the risk of regulatory change to Cardiosom. Nothing in Article II.D warned RUSH that Congress might terminate the contract, or that CMS would attempt to shift the risk of such a termination to RUSH. Based on the contract language alone, it is clear that defendant is liable for breach of contract to Cardiosom and has no defense for its breach.

The court also has considered carefully the circumstances surrounding the contract formation here and has found nothing in the record suggesting that when Cardiosom signed the contract in March 2008, the parties intended Article II.D to be read in any way other than is reflected in the title of Article II ("Compliance with Laws and Regulations")—that is, a commitment to follow the applicable law. The court is of the view that a reasonably intelligent person acquainted with the contemporaneous circumstances would be unlikely to ascribe the risk-shifting meaning to Article II.D urged by defendant. See EG-Paradigm Envtl., Inc., 465 F.3d at 1338.

Plaintiff has argued, in the alternative, that defendant's interpretation of Article II.D would make the contract illusory. Pl.'s Mot. 29-30. The court, however, has found that defendant failed to carry its burden on its defense that Article II.D is risk-shifting language, and thus, does not address further plaintiff's alternative argument or defendant's response thereto.

IV.   Conclusion and Further Action

For the reasons discussed herein, plaintiff's motion for summary judgment on contract liability is **GRANTED**. Defendant's cross-motion for summary judgment on contract liability is **DENIED**.

Plaintiff now bears the burden of establishing its damages, and showing that it has not previously received reimbursement through the CMS administrative process for any monies it now seeks through this court. See Cardiosom, 115 Fed. Cl. at 778 ("It merits mention that . . . [plaintiff] bears the burden of showing that any damages it seeks from this court do not include any of the amounts already recouped through the CMS administrative process." (citing Cardiosom, 656 F.3d at 1328-29)).

The parties are directed to file a proposed schedule for briefing on summary judgment on damages no later than **July 21, 2014**.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith  
PATRICIA E. CAMPBELL-SMITH  
Chief Judge